# OCTOBER TERM, 1858, AT DETROIT.

---

### Jane Wilson and Another v. Eunice T. Wilson.

The declarations of a person since deceased, can not be made evidence on behalf of his representatives, any more than on his own behalf while living, for the purpose of showing what were the terms of a parol contract made by him for the conveyance of lands, and which is sought to be enforced against such representatives.

On a bill for the specific performance of a parol contract for the conveyance of lands, the contract must be proved in the clearest manner, and must be substantially the same set forth in the bill.

Accordingly where wife and husband filed their bill on behalf of the wife, alleging a parol agreement on the part of the devisor of defendant to convey certain lands to the wife, and asking its specific performance, but, from the testimony, it appeared that the agreement was to convey to the husband;—*Held,* That the bill must be dismissed, notwithstanding there was evidence in the case that the husband afterwards directed the conveyance to be made to the wife, and the other party assented to its being so made.

*Heard October 12th and 13th. Decided November 12th.*

Appeal from Wayne Circuit in Chancery, where decree was rendered in accordance with the prayer of the bill.

The case, so far as necessary to illustrate the decision of the Court, is set forth in the opinion.

*C. I. Walker,* for complainants:

The testimony clearly shows that, by the contract of February 21st, 1853, the sixteen acres were to be conveyed to the complainant Jane. It also shows that she took possession of the premises, by her agents and tenants, and received the rents therefor.

The contract being proved as alleged in the bill, it is a clear case for a specific performance, under the most stringent

doctrine upon that subject.    Here is a complete performance on the part of Charles M. Wilson, by the conveyance of February 21st, 1853, and the reception of the mortgage from Heath by Henry J. Wilson.    Jane also took possession under the contract.    All was completed, except the conveyance of the sixteen acres to Jane.—2 *Story Eq. Juris.* 759; *McMurtrie v. Bennette, Harr. Ch.* 124; *Ex parte Storer, Davies,* 294; *Gilmore v. Johnston,* 14 *Ga.* 683; *Wetmore v. White,* 2 *Cai. Cas.* 87.

*J. M. Howard,* for defendant:

Henry J. Wilson, according to the bill, was to hold, and, on the delivery to him of the deed, did hold, the premises, not for his own use and benefit, but for the use and benefit of Jane.    The title was, therefore, held by him *in trust,* and he was a trustee.    Such a trust is void by our Statute of Frauds, unless proved by some deed or conveyance subscribed by the party declaring the same, or by some person thereunto by him lawfully authorized by writing.—*Comp. L. p.* 912.

The present is not the case of a resulting trust, where the money is paid by one person, and the title taken in the name of another.— *White v. Carpenter,* 2 *Paige,* 238.    But this kind of resulting or implied trusts is, by our Statute of Uses and Trusts, abolished, and the party paying the purchase money has no title or claim whatever.—*Brewster v. Power,* 10 *Paige,* 569; *Garfield v. Hatmaker,* 15 *N. Y.* 475. And where the trust is simple, and for the use and benefit of another, the beneficiary takes the whole title, legal and equitable.—*Selden v. Vermilyea,* 3 *Comst.* 535.    Indeed, this case does not fall within any of the classes of resulting trusts defined by Lord Hardwicke, in *Lloyd v. Spillett,* 2 *Atk.* 148, and by Chancellor Kent, in 4 *Kent,* 305, 306.    And such a trust is forbidden by our Statute of Uses and Trusts, secs. 1 and 5.

But reliance is placed on the agreement of February 21st, as a *contract* to convey to Jane.    Such a contract is a mere

WILSON *v.* WILSON.

nullity.—11 *Paige*, 405, 410; 26 *Wend.* 34; 6 *Metc.* 319. But the bill relies upon part performance to take the case out of the statute. The part performance alleged is *the taking of possession* by Jane, and the *expenditure of moneys* in repairing the fences. To take the case out of the statute on this ground, it is indispensable that the acts done should be clear and definite, and referable exclusively to the contract, and the contract should also be established, by competent proof, to be clear, definite, and unequivocal in its terms. —2 *Story Eq. Juris.* 764; *Weed v. Terry*, 2 *Doug. Mich.* 352. The alleged possession should be notorious.—7 *Barr*, 157; 4 *Blackf.* 94; 19 *Pa. St.* 461; 6 *Watts*, 464; 7 *Barr*, 91. And under and in pursuance of the contract of sale.— 8 *S. & R.* 543; 3 *Ves.* 378; 18 *Ves.* 328; 14 *Pa. St.* 260; 22 *Ibid.* 225. And with the knowledge and consent of the vendor.—1 *Bro. C. C.* 409; 18 *Ves.* 328; 9 *Watts*, 106.

The original arrangement, as proved, was to convey the premises in controversy to Charles Wilson, instead of Jane. If so, it divests the alleged possession and improvements of all the characteristics of part performance in favor of Jane. But this alleged possession is not sufficiently proved. And as the alleged rights of Jane arose, not out of the original contract, but, if at all, out of a subsequent verbal one, without consideration, it can not be enforced in her favor.—6 *Paige*, 288, 292.

*Walker*, in reply:

This was not a trust within the authorities cited, or within the statute. No agreement is alleged or proven that Henry Wilson was to *hold* this land *in trust* for any one; but he was to *convey*, immediately, on demand.

CAMPBELL J.:

The complainants file their bill for the conveyance of two lots of land in Wayne county, alleged to be held by the defendant as devisee of Henry J. Wilson, deceased.

The claim for relief is based upon an agreement which is averred to have been made by Henry J. Wilson during his lifetime, under the following circumstances:

In February, 1853, Charles M. Wilson was the owner of a tract of land lying partly south and partly north of the Grand River Road, the larger portion lying south of the road. The north tract was divided into three lots, the middle one being a tavern-stand then occupied by George Heath. Henry J. Wilson held a purchase-money mortgage on the whole property, for four thousand five hundred dollars. On the 21st day of February, 1853, Charles M. Wilson, and Jane Wilson, his wife, conveyed the whole premises to Henry J. Wilson, by a warranty deed. On the 27th day of the same month, Henry J. Wilson conveyed the tavern-stand, consisting of about eight acres, to George Heath, taking back a mortgage for four thousand five hundred dollars. In July, 1856, Henry died, seized of the remaining premises, and the defendant was made his universal legatee, and also took out letters of administration with the will annexed. The controversy in this case arises upon the lots north of the Grand River Road, upon each side of the Heath tract.

The bill sets up that Charles M. Wilson, being about to go to California, to be absent for some time, and being desirous of disposing of his remaining interest in the property, which was subject to the mortgage to Henry, and, at the same time, of making some provision for his wife Jane, entered into an agreement with Henry, on the 21st day of February, 1853, to sell and convey to him the whole property, including the Heath tract (which the bill states Charles was bound to convey to Heath), and that, in consideration thereof, Henry agreed to convey to Heath this tract, and also agreed, immediately, and whenever demanded, to execute to Jane Wilson, wife of Charles, a warranty deed of the two adjacent lots. That in pursuance of this agreement, Charles and his wife made the conveyance of February 21st to Henry, and Henry, also in pursuance of the agreement,

conveyed the tavern-stand to Heath, but neglected during his life to convey the other lots to Jane. That Charles immediately left for California, and was absent until June, 1856. The bill also contains statements of possession by Jane and her lessees.

The bill does not state whether the agreement was verbal or written. The answer admits nothing, and puts the whole case at issue.

The defense made upon the hearing was two-fold: *First*, That the complainants do not prove their case in substance, as alleged; and, *Second*, That the case which they seek to make is within the prohibitions of the Statute of Frauds and the Statute of Uses and Trusts.

We propose to examine first into the case made by the proofs. As the party in default, Henry J. Wilson, died before the bill was filed, and as Mr. Selkrig, a principal witness, died before proofs were taken, justice to all parties requires that the whole transaction should be carefully investigated.

It is very evident that whatever agreement was originally made between Charles and Henry Wilson, was made on the 21st of February, 1853. The bill alleges this, and Marvin's testimony confirms it. No witness testifies to any previous understanding. The conveyance being then made, and the bargain announced just after to Marvin and Selkrig, who witnessed and drew the deed, there can be no doubt that the conveyance and agreement were but one transaction. It is equally plain that when Henry received the conveyance, there was an understanding, not only that he should complete the bargain which Charles had made with Heath, but that the adjoining lots were in some way, and for some purpose, to be held or disposed of for the benefit of Charles or his wife. And in considering this branch of the case, we must determine whether we have evidence showing the whole contract, and, if so, what it was.

The natural inference from the bill would be that Henry. was to take the fifty acres south of the road in satisfaction of his mortgage, and dispose of the rest as Charles then required, namely, by conveying the tavern - stand to Heath, and doing with the other two lots as was agreed. But the proof showing that Heath was to give, and did give, back a mortgage to Henry, nearly, if not quite, equal· in amount to Henry's mortgage against Charles, leaves the. case as if the whole fifty acres south of the road were a mere gift to Henry, or, what is equivalent, passed without any pecuniary consideration.    The ·difference between the. mortgages could not have exceeded three hundred dollars, which would be of no account in making up the price of· the land.    These facts are not in accordance with the theory of the bill, and it is not. at all likely that this could have been all the arrangement.    If such had been the real trans-. action, the magnitude of the gratuity to Henry would have made it probable, at least, that any conversation intended to inform relatives or witnesses of the terms of the arrange-. ment would not have ignored so important an item.    The matter is mentioned to Marvin as a *trade;* and such is the. theory of the case.    It is much to be regretted that we. have not more light upon this part of the transaction.    If· any other consideration passed between the parties, it might· go far to explain the whole affair.

Leaving this question, and looking simply to the equities; claimed for Jane Wilson upon the two lots in controversy, the inquiry next arises concerning her individual rights—the bill being filed entirely on her behalf.    The allegations are, that Charles was about leaving for California, and that the arrangement was made, partly to settle up his affairs with Henry, and partly to make provision for his wife.    Such would be an appropriate and natural occasion for a settlement for her· benefit.    But, according to the testimony of· the complainant's witnesses, his intention to go to California was formed some. time after the date of this agreement,

and—whether formed or not—was not expressed either to his relatives or to those to whom the terms of the bargain were communicated. These witnesses do not connect the original bargain with any allusion to California. And inasmuch as the origin of the provision for Jane is made, by the bill, to spring from the intention of Charles to go there—and such would be a very likely thing to originate it—the evidence should be examined with some regard to this theory.

In looking into the testimony, to ascertain what the original bargain was, we are compelled to disregard almost entirely the depositions on behalf of the defendant. They are mainly declarations of Henry Wilson; and while the complainants are entitled to prove his admissions, the rule will not allow his declarations to be introduced on behalf of his representatives, any more than of himself if he were living. The case must therefore stand, so far as the terms of the contract are concerned, upon the testimony of Mary Wilson (mother of Charles and Henry), George Heath, and Russell Marvin, a brother-in-law of the Wilsons.

Mary Wilson testifies that Henry informed her that, in the trade, he had taken back the south tract, and Charles was to have the two lots, and they were to be deeded to the wife of Charles. She is not asked, nor does she testify, at what time this statement was made to her. Taken alone, it certainly has a strong tendency in favor of the complainant's case. George Heath, who was informed of the arrangement within a few days, testifies that it was agreed that Charles was to have the lots. The only allusion he heard to Jane was when he applied to Henry to buy the lots, and Henry replied he could not sell them; that they belonged to Charles; that he had not given Charles a deed of them; that Charles was going to California, and, if he never came back, he would give the deed to the wife of Charles. Marvin testifies that on the day the deed was made to Henry, the bargain was stated to him by the parties, in presence of Mr. Selkrig.

According to that statement, Henry was to allow Charles what he had already received from Heath, and give up the notes and mortgage, and give Charles the land on the north side of the road. No mention was made of its being deeded to any one in particular. But on the night before Charles left for California, which was the 30th of April or the 1st of May, the matter of the property was talked over at a family meeting at Marvin's, and Henry was to give a deed to Jane whenever she wished it.

Looking at the whole case, we can not avoid the conclusion that the probabilities are in favor of the idea that the disposition of these lots for the separate use of Jane was not determined on until Charles concluded to go to California, and formed no part of the original arrangement. That such an arrangement was finally made, is highly probable, but we can not satisfy ourselves that the testimony goes any further.

With this view of the facts, we can not grant the relief prayed for. Not only must the contract, when resting in parol, be proved in the clearest manner, but it must be substantially the same set forth in the bill. An original agreement to deed to Charles, or to hold subject to his disposal, might stand upon very different legal grounds from an original agreement to convey to Jane. And a subsequent agreement in her favor would also stand on a very different footing from an original one, and would require proof of the considerations which led to it.

The grave questions arising under our statutes touching the validity of any of these arrangements, we do not now propose to consider. They can only be applied with certainty where the facts are well ascertained, and proof is made of a definite agreement. If the parties should be enabled hereafter to procure such proof as will warrant them in seeking relief, those legal principles may come up in a shape to authorize action upon them. We refuse relief in this case because, whether the bargain in question would have

been regarded as legal or illegal, it is not made out to our satisfaction by the evidence.

The bill must be dismissed, but it may be done without prejudice.

The decree of the court below must be reversed, and a decree entered dismissing the bill of complaint, with costs, without prejudice.

The other Justices concurred.